[Civ. No. 2627.  Third Appellate District.—July 28, 1923.]

# THOMAS D. CALKINS, Respondent, v. MALCOLM F. CALKINS et al., Defendants; VEDA H. CALKINS, Appellant.

[1] TRUSTS—PARTNERSHIP—EVIDENCE—FINDING.—In this action by a father against his son and daughter-in-law to enforce a constructive trust, the testimony of the father and the son that they executed a written agreement to engage in the newspaper business and to share equally the profits and losses, although neither of them could say what became of said instrument, was sufficient to support the finding by the trial court of the existence of the partnership between them.

[2] ID.— EQUITABLE OWNERSHIP OF CORPORATE STOCK — NOTICE — TITLE.—Notwithstanding the legal title to the property was held by a corporation and the business was conducted and controlled through its officers, the equitable owners of the stock having been the father and son, each was entitled to one-half of the proceeds of the sale of the stock and business as provided in their partnership agreement; and the daughter-in-law, knowing those facts and in taking title to the property in her own name, was a trustee for the partners.

[3] ID.—HOLDING PROPERTY IN TRUST—PLEADING—EVIDENCE.—In an action to enforce a constructive trust, the plaintiff may allege that he is the owner of the property and that the defendant without right withholds from him its possession, and if the defendant sets up title in himself the plaintiff may be permitted to show that he is the equitable owner and that the defendant holds the title in trust for him.  In other words, under such pleadings the plaintiff may introduce evidence to avoid the affirmative defense and to recover, if in good conscience he ought.

[4] ID.—FRAUD—STATUTE OF LIMITATIONS.—The property of which the father and son were the equitable owners as partners having been transferred to the daughter-in-law with intent to deprive the father of his interest in the property, and as part of a conspiracy between the son and the daughter-in-law to defraud the father of his rights, the case was governed by the provisions of subdivision 4 of section 338 of the Code of Civil Procedure, and the cause of action by the father to enforce the trust did not accrue until the discovery by him of the facts constituting the fraud.

---

1.  Effect of agreement to share profits to create partnership, notes, 43 Am. St. Rep. 229; 18 L. R. A. (N. S.) 963; L. R. A. 1918F, 801.

[5] ID.—LACHES—EVIDENCE—DISCRETION—APPEAL.—The delay of the
father in bringing the action against the daughter-in-law to en-
force the constructive trust in the property conveyed to the latter
having been at the son's request and with the view of facilitating
a reconciliation between the son and daughter-in-law, who were
separated, the appellate court could not say that the trial court
committed an abuse of discretion in accepting that explanation
and in determining that the action was not barred by laches.

[6] ID.—EXTENT OF INTEREST—UNWARRANTED JUDGMENT.—The prop-
erty in question having been purchased in part with assets of the
partnership, which were owned equally by the father and the son,
and in part with money of the daughter-in-law, to whom the son
had conveyed his interest, a judgment that the father and the
daughter-in-law were equal owners in the property was unwar-
ranted.

APPEAL from a judgment of the Superior Court of
Merced County. E. N. Rector, Judge. Reversed.

The facts are stated in the opinion of the court.

Fowler & Nichols, V. L. Hatfield and W. H. Hatfield for
Appellant.

J. R. McHenry and Edward Bickmore for Respondent.

BURNETT, J.—In 1911 the appellant and the defendant
M. F. Calkins were husband and wife and were living in the
city of Salinas, Monterey County. At that time he and one
Homer W. Wood were the principal owners of a newspaper
known as the "Salinas Democrat," which was conducted by
the Democrat Publishing Company, a corporation. In the
year 1912 plaintiff, who is the father of said M. F. Calkins,
came to Salinas from Hayward and they purchased the
interest of said Wood in the paper. The corporation con-
tinued its publication as before.

In the fall of 1914 M. F. Calkins took an assignment
from one Megladdery of a lease of the "Monterey Cypress,"
a newspaper published in the city of Monterey, paying
therefor the sum of $150. There was a lack of equipment
in said newspaper and M. F. Calkins went to Oakland and
borrowed from his father-in-law, a Mr. Hatfield, the sum of
$1,000, for which a note was given signed by said Calkins
and by appellant. About $250 of this money was used in

paying bills and the balance of $750 went into said additional equipment. A little later plaintiff came from Salinas to Monterey and he put into the said "Monterey Cypress" quite a sum of money, admitted by appellant to be over $1,500, and a linotype machine. On February 28, 1914, the Monterey Publishing Company was incorporated with a capitalization of 1,500 shares of the par value of ten dollars each. This company took over all the assets of the "Monterey Cypress," for a part of which it executed its note for the sum of $1,100 to James A. Murray, the former owner of the paper. All the business thereafter in connection with said newspaper was done in the name of the corporation. A certificate of stock for 751 shares was issued to appellant Veda H. Calkins. The stock-book was destroyed and the parol evidence does not make it clear how many shares were originally held by respondent, but it does appear that on February 5, 1916, 751 shares were in the name of appellant, 60 shares in the name of respondent and various other persons held sixty-nine shares. These were all the outstanding shares and on October 28, 1916, 878 shares were sold to Wallace C. Brown and one each to two other persons. Thus were virtually the entire property and business transferred to said Brown. The equipment was not sold in the name of the Monterey Publishing Company but of V. H. Calkins. As payment for this paper Brown turned over $500 in cash, a mortgage for $2,100 made in his favor by one A. B. Smith and his own promissory note for $1,200. V. H. Calkins had confidence in her husband and gave him a power of attorney to transact her business. He was trusted implicitly also by the father, who left the management and control of his interests entirely to his son. Late in 1916 the "Turlock Tribune" was purchased from H. W. Dockham by V. H. Calkins, through M. F. Calkins, her attorney in fact, and one Lou K. Newfield, with whom she had previously entered into an agreement of partnership in Monterey for conducting said "Tribune." This agreement fixed the respective interests at seven-tenths for her and three-tenths for him. Shortly afterward they and M. F. Calkins came to Turlock and began to publish the paper under the name of Calkins and Newfield. The total price to be paid for the "Tribune" was $10,000, of which Newfield contributed $1,500 in cash, V. H. Calkins the $500 paid by Brown, and she put up the

twenty-one hundred dollar mortgage and Brown's stock in the Monterey Publishing Company, which had been pledged to her as collateral. The plaintiff came to Turlock some time after said purchase and worked for a while as a printer on the paper and then went to Atwater, where he and M. F. Calkins purchased the "Atwater Signal." On November 7, 1917, M. F. Calkins made an assignment to Veda H. Calkins of all the interest he had in the "Turlock Tribune," requesting in said written assignment that appellant pay to respondent the sum of $1,317.50, which he acknowledged to be due his father as the latter's share of the proceeds of the stock of the Monterey Publishing Company. M. F. Calkins then left the "Tribune" and did not return. On two different occasions the "Tribune" printed the certificate of partnership, showing that Veda H. Calkins and Lou K. Newfield were partners in conducting the paper, the latter publication being September 10, 1917. On April 3, 1918, the "Tribune" printed the statement of circulation, ownership, etc., required by the federal law, showing the owners of the paper to be Calkins and Newfield. A similar statement was published April 2, 1919, representing the owners as V. H. Calkins and Lou K. Newfield. On March 27, 1920, Newfield sold his interest in the "Tribune" to Veda H. Calkins and ever since that date she has conducted the paper under her own name as the sole owner.

In addition to the foregoing undisputed facts, plaintiff claims that other matters should be considered, upon which more particularly he bases his claim of justification for the judgment in his favor. He contends that, in the latter part of December, 1912, in the city of Salinas, he and his son entered into a partnership for the purpose of owning and publishing different newspapers; that said partnership acquired the said "Salinas Democrat," which was published by the Democrat Publishing Company, and later acquired the "Monterey Cypress" and organized said corporation, the Monterey Publishing Company, for the purpose of printing and publishing the latter paper; that defendant M. F. Calkins was the business manager of these two different newspapers and had full charge of said newspaper business; that when the Monterey Publishing Company was first organized defendant M. F. Calkins caused to be issued in the name of his wife, Veda H. Calkins, 751 shares of the capital stock

of said corporation but the certificate was never delivered to her but was indorsed by her in blank and remained in the safe deposit of M. F. Calkins until the subsequent sale to Wallace Brown; that said Veda H. Calkins was never in fact the owner of said stock but that virtually the whole of the capital stock and the entire plant and business belonged to said partnership.

Moreover, plaintiff had practically nothing to do with the management of any of these newspapers but entrusted it exclusively to said son, and he did not know until some time thereafter that any of said stock had been issued to Veda H. Calkins; that upon the purchase of said "Turlock Tribune" defendant M. F. Calkins, without the knowledge of plaintiff, caused the said seven-tenths interest purchased by said partnership to be taken in the name of his wife and that unknown to plaintiff the said copartnership agreement between said Veda H. Calkins and Lou K. Newfield was drawn up representing their interests as aforesaid; that these various acts, making it appear that Veda H. Calkins was the owner of seven-tenths interest in said "Tribune," were the result of a conspiracy between her and M. F. Calkins to defraud plaintiff of his interest in and to said property; that M. F. Calkins was manager of the "Turlock Tribune" from the early winter of 1916 up to the latter part of 1918, when the defendants separated as husband and wife, he entering the army and being discharged therefrom a few months later; that he returned to Atwater about January 1, 1919, when he made to his father a complete disclosure of his manipulation of the stock of the Monterey Publishing Company and the placing in his wife's name of the partnership interest in the "Turlock Tribune"; that appellant had at all times full knowledge of the interest and claims of plaintiff in and to the publishing business in Salinas, Monterey, and Turlock and her claim of ownership of the "Tribune" is based upon said fraudulent conduct. The findings were in favor of plaintiff and the judgment was for a dissolution of the partnership and that "a full accounting of all the transactions done and had by said Veda H. Calkins in the matter of said newspaper business and the matters incidental thereto at all times since she became a trustee for the interest of said plaintiff in and to said 'Turlock Tribune' newspaper business and at all times since the

legal title thereto has been held in her name should be had; that upon said full accounting had, the property of said copartnership and the partnership property now owned by plaintiff and defendant Veda H. Calkins be sold and the debts and liabilities (if any) of said copartnership be paid and any surplus remaining be divided between plaintiff and defendant Veda H. Calkins, and said defendant Malcolm F. Calkins, according to their respective interests therein." It may be added that it was found specifically that plaintiff is the owner of one half and Veda H. Calkins of the other half of said property.

The action is essentially one to enforce a constructive trust. This is conceded by both parties, although the complaint does not set forth any fraudulent conveyance, but alleges the existence of said partnership, the purchase by it of said newspapers, the complete management thereof by M. F. Calkins, the placing by him of said Veda H. Calkins in possession of said "Turlock Tribune," the publishing plant and books and accounts in connection therewith, the wrongful use and conversion by her of a large amount of the funds of said copartnership, threats by her to sell or encumber said property; "that at divers and various times plaintiff has requested and demanded of defendant, Malcolm F. Calkins, an accounting of the business of said 'Turlock Tribune'; that at all and each of said times defendant, Malcolm F. Calkins, did promise and agree with plaintiff, that he would so account with plaintiff," but he has failed and refused to do so. The prayer was for an accounting, for a dissolution of the partnership, for a preliminary restraining order to prevent the sale or encumbrance of any part of the property, for the appointment of a receiver and for the sale of the partnership property, and after the payment of its debts and liabilities, for a division of the surplus between plaintiff and defendant, M. F. Calkins. The answer denied that such partnership ever existed, and, as an affirmative defense, set up her sole ownership of the Tribune Publishing business, laches on the part of plaintiff in originally bringing the action and the statute of limitations.

[1] The first point made by appellant is that the defendant failed to prove the existence of a partnership. The testimony of father and son was somewhat vague and un-

satisfactory as to this issue. However, they both declared in effect that they executed a written agreement to engage in the newspaper business and to share equally the profits and losses. Neither could say what became of said instrument but their oral testimony as to its substance and effect must be held to constitute sufficient support for the finding of the court. In view of the rule that governs an appellate court in considering a question of evidence we cannot say, as contended by appellant, that the claim of partnership was an "afterthought" and was fabricated by plaintiff to avoid the statute of limitations. [2] In this connection appellant with apparently greater assurance insists that the court was entirely in error in finding that said partnership owned the business. "It is not denied," so she says, "by either the plaintiff or the defendant Malcolm F. Calkins that both the 'Salinas Democrat' and the 'Monterey Cypress' were operated as corporations, and that the plaintiff was a stockholder in both of those papers. It seems to be the theory of the plaintiff that by holding stock in a corporation one can be a partner. It is appellant's theory that the two forms of association are mutually exclusive of each other and that if property is owned by a corporation it cannot at the same time be owned by a partnership." Many authorities are cited in support of this position, including the carefully considered opinion in *Jackson* v. *Hooper,* 76 N. J. Eq. 592 [27 L. R. A. (N. S.) 658, 75 Atl. 568], wherein it was said: "The law never contemplated that persons engaged in business as partners may incorporate with intent to obtain the advantages and immunities of a corporate form, and then, Proteus like, become at will a copartnership or a corporation, as the exigencies or purpose of their joint enterprise may from time to time require. The policy of the law is to the contrary. If the parties have the rights of partners, they have the duties and liabilities imposed by law and are responsible *in solido* to all creditors. If they adopt the corporate form, with the corporate shield extended over them to protect them against personal liability, they cease to be partners, and have only the rights, duties, and obligations of stockholders. They cannot be partners *inter sese* and a corporation as to the rest of the world. Furthermore, upon grounds of public policy, the doctrine contended for cannot be tolerated, as it renders nugatory and void the au-

thority of the legislature—a co-ordinate branch of the government established by the constitution—in respect to the creation, supervision, and winding up of corporations." Undoubtedly the legal title to this property was held by said corporation and the business was conducted and controlled through its officers and not by the partnership as such. There is, however, evidence in the record justifying the view that the equitable owners of the stock in the "Democrat" and the "Cypress" were plaintiff and his son and that this was known to appellant. This being so, in view of the said agreement between these equitable owners each would be entitled to one-half of the proceeds of the sale of the stock and business as provided in said agreement. Knowing these facts and that the proceeds of the sale of the "Cypress" went into the purchase of the "Turlock Tribune," appellant to that extent, in taking the title in her own name, would be a trustee for the partners. While, strictly speaking, it may not be accurate to declare the partnership owned or operated said business, yet it is reasonable to say that it was owned and operated for the benefit of said partners and the partnership was entitled to the proceeds of the sale. We think this is, in effect, the finding of the trial court.

Appellant next contends that "the plaintiff failed to sustain the case made by the pleadings." The point is that in the complaint it was alleged that the partnership is the owner of the "Turlock Tribune" and defendant V. H. Calkins is in possession of the said property owned by the partnership, whereas the evidence of plaintiff shows that the paper "was purchased in the name of V. H. Calkins and L. K. Newfield. The legal title to the 'Tribune' was therefore in the defendant Veda H. Calkins and L. K. Newfield from the beginning and thereafter vested entirely in the defendant V. H. Calkins. . . . It is obvious that what plaintiff meant to do was to attempt to establish a constructive trust in the property of the 'Turlock Tribune' upon the theory that he advanced part of the consideration for its purchase, and that the defendant V. H. Calkins was what is known under the law as an involuntary trustee. In order to raise this issue it is axiomatic that he should have pleaded the facts upon which the court could find the existence of a constructive trust." Among the authorities cited in support

of this view is 21 Corpus Juris, 670 et seq. As an example of what such complaint should contain reference is also made to the case of *South San Bernardino etc. Co.* v. *San Bernardino Nat. Bank,* 127 Cal. 245 [59 Pac. 699]. It may be admitted that the suggested course is the one usually pursued and may be the better form, but under our liberal system of practice it is not required. **[3]** The plaintiff may allege that he is the owner of the property and that the defendant without right withholds from him its possession, and if the defendant sets up title in himself the plaintiff may be permitted to show that he is the equitable owner and the defendant holds the title in trust for him. In other words, under such pleadings the plaintiff may introduce evidence to avoid the affirmative defense and to recover, if in good conscience he ought. The rule is thus stated in *Wendling etc. Co.* v. *Glenwood etc. Co.,* 153 Cal. 411 [95 Pac. 1029] : "It seems clear that in an action brought upon the theory that the vendor is the owner and entitled to the possession of the property and that the defendant unlawfully withholds possession thereof, or has converted the same to his own use, the general allegations of ownership and right to possession, and unlawfully withholding or conversion are sufficient and will render admissible proof of any facts sustaining such claim. . . . It is not correct to say in a case of the character before us that the plaintiff's cause of action rests upon fraud. It rests upon his ownership of the property and the conversion thereof by defendant and fraud comes in only in reply to the defense that the defendant is the owner by reason of an alleged sale by the plaintiff. Technically proof of fraud as to such sale was not a part of plaintiff's *prima facie* case and was available only in reply to any claim of defendant based on the sale, but this was a mere matter of proof. It is the general rule that in actions for the conversion of personal property where the property has been procured by fraud it is not necessary to allege the fraud but it is sufficient to declare generally that the property was wrongfully converted." The supreme court therein cites a large number of authorities so holding, and reviews various decisions in this state in harmony therewith.

In this connection it may be observed that appellant criticises, as going beyond the issues of the case, the action

of the trial court in finding that Veda H. Calkins holds and possesses an undivided one-half interest of said property as a trustee for plaintiff. But, as we have seen, the general allegations of the complaint and the denials and averments of the answer raised the issue as to the character of respondent's as well as that of appellant's asserted title. It is true that there was no allegation that she held as trustee, but this was included in the more general and comprehensive allegations. The court was satisfied from the evidence that the property was purchased with the funds of the partnership and that the title was fraudulently taken in the name of appellant; that thereafter M. F. Calkins transferred to her all his interest in the same, but respondent was still the equitable owner of an undivided one-half interest thereof. It would follow as a legal conclusion that she was the trustee for plaintiff to that extent and at most this peculiar finding, whether regarded as of fact or as a legal conclusion, was unnecessary but not prejudicial. We are not unmindful of the fact that the complaint is more specific as to her possession than we have thus far indicated, and it could be plausibly argued that said finding is directly responsive to said allegation, but we deem the matter of too little importance for further consideration.

[4] A more serious contention, as we view it, is that "the plaintiff's real cause of action is barred by the statute of limitations." Respondent contends that the case furnishes an instance of a constructive trust. We need not descant upon the peculiar features of that kind of trust, as known to our law, or to differentiate it from a resulting trust. These terms have been often explained by the courts, and for a concise statement of their character it is sufficient to refer to the comparatively recent decision of the supreme court in *Lezinsky* v. *Mason Malt Whiskey Distillery Co.*, 185 Cal. 240 [196 Pac. 884]. Appellant's claim is that the statute of limitations began to run when the title to the property was taken in her name, regardless of any notice to the plaintiff or of the doctrine of being put upon inquiry. If that is the law, then, obviously, the judgment should have been in her favor, since more than four years intervened between that event and the filing of the complaint herein. In support of her position appellant cites, among other cases, *Hecht* v. *Slaney*, 72 Cal. 363 [14 Pac. 88]; *Nougues* v. *New-*

*lands*, 118 Cal. 106 [50 Pac. 386]; *Broder* v. *Conklin*, 121 Cal. 282 [53 Pac. 699]; *Barker* v. *Hurley*, 132 Cal. 26 [63 Pac. 1071, 64 Pac. 480]. In the first of these it is said: "The statute of limitations runs in favor of a defendant chargeable as trustee of an implied trust, and it is not necessary in order to set the statute in motion that he should have denied or repudiated the trust. In such a case the statute begins to run when the wrong complained of is done, and the limitation, under section 345 of the Code of Civil Procedure, is four years." A similar statement is made in some of the other cases. Indeed, in *Lezinsky* v. *Mason Malt Whiskey Distillery Co., supra*, it is said: "In the case of a constructive trust, however, the statute begins to run at once upon the doing of the acts by reason of which the trust arises. (*Hecht* v. *Slaney*, 72 Cal. 363 [14 Pac. 88].)" But, of course, this sweeping generalization of the court must be interpreted in the light of the facts of each case. In most of the decisions cited it appears that the defrauded party had knowledge of the fraud at the time it was committed or of facts sufficient to put him upon inquiry. For example, in the leading case of *Hecht* v. *Slaney*, it is said: "As the plaintiff's cause of action was commenced more than four years after the order staying all proceedings against the insolvent ceased to be in force, it was clearly barred, unless saved by the averment in the complaint that neither the plaintiff nor his grantor had any notice of the order setting aside the homestead, or of the false and fraudulent representations in the petition asking that it be set aside, until the 7th of May, 1884.

"But these were matters of record in the court which with reasonable diligence Levy, the assignor, might seasonably have known, and it would seem should have known. . . . The rule in such cases is, that a party is presumed to know whether he might, with reasonable diligence, have discovered; and when the fundamental facts upon which the alleged fraud rests are matters of public record, open to his inspection, ignorance of the fraud will not excuse his laches nor stay the running of the statute." In other instances, a purely constructive trust was involved without the element of actual fraud as in *Benoist* v. *Benoist*, 178 Cal. 234 [172 Pac. 1109]. But herein the claim of respondent is that the acts of appellant culminating in the transfer to her of the

title to seven-tenths of said property were based upon an intent to deprive plaintiff of his interest and of a conspiracy between her and her codefendant to defraud respondent of his rights. This, as we have seen, was not alleged in the complaint, but evidence was received to that effect and we are not prepared to say that such theory is entirely unsupported. In such cases, as we understand the rule, subdivision 4 of section 338 of the Code of Civil Procedure applies. Therein it is provided that "the cause of action in such case is not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." We think the case is governed by the principle stated in *Unkel* v. *Robinson,* 163 Cal. 648 [126 Pac. 485], wherein it is said: "True, the appellant is seeking to establish a constructive trust, but such a trust may arise under various circumstances which may embrace no element of fraud in fact, or technical fraud within the law. Here the constructive trust which appellant endeavors to have established is based on fraud as the substantive cause of action." The complaint therein alleged "that defendant had, between the months of May and November, 1905, fraudulently procured from plaintiff various sums of money aggregating $4,020, which she had used in purchasing a house and lot in the city of Los Angeles and that such fraud was not discerned by plaintiff until about November 1, 1905." The prayer was "that it be declared that defendant held said real property as a trust for plaintiff for the amount of said $4,020; that said property be sold and that said amount so fraudulently procured from plaintiff be paid to him from the proceeds of such sale." The supreme court declared that the action was governed as to the statute of limitations by the case of *Boyd* v. *Blankman,* 29 Cal. 20 [87 Am. Dec. 146], and *Duff* v. *Duff,* 71 Cal. 513 [12 Pac. 570], and referred approvingly to *People* v. *Blankenship,* 52 Cal. 619, *Moore* v. *Moore,* 56 Cal. 89, and *Caster* v. *Geil,* 110 Cal. 292 [52 Am. St. Rep. 84, 42 Pac. 804]. We may add that in *Earhardt* v. *Churchill Co.,* 169 Cal. 728 [147 Pac. 942], the Unkel case is cited with approval. If said section applies to the situation herein then the question arises whether it must be held that plaintiff at any time three years before the filing of the complaint had knowledge or ought to have

known of said transfer. Appellant makes a strong showing in favor of her contention that respondent must have known of the transfer of the property to herself and Newfield. She calls attention to the fact that the transaction was open and notorious, that the certificate of copartnership between them was published in the "Tribune" on two different occasions, and to other circumstances, which we need not enumerate, making it seem probable that he did have notice of her claim more than three years before he brought the action, or at least, that he had knowledge of facts which he should have followed up and thereby acquired the information. The conduct of respondent as related by him does appear strange and unusual. It is doubtful if many men would manifest such indifference to their property interests, but we cannot say that his story is unbelievable. We cannot hold that it is an unreasonable inference from his testimony that he was in no manner apprised of the transfer to appellant and of her claim to the property until the fall of 1918 and that he did not have actual knowledge thereof until January 1, 1919. As to his failure to inquire, it must be remembered that he had utter confidence in his son and left the management of the business entirely in his hands. It is true that before the sale of the Monterey paper he was informed that the majority of his stock had been issued in the name of appellant but his son assured him that no trouble would result therefrom and that he need not be disturbed. Besides, appellant wrote to him as follows:

"Dear Daddy Calkins: Just must tell you how sorry I am for making any ill feeling—just my stupid business sense, and because Malcolm had not made everything plain. I know your interest is the same as ours of course—the reason the stock is in my name now is to prevent any one taking the business away from us. I'll learn some day Daddy Calkins—please just love me and if Malcolm goes to Monterey I'd love to carry out Mother Calkins' plans and look after the house and be a daughter to you while she has to be away," etc. She also wrote to the wife of respondent that "As for the 'Cypress' I haven't had a real understanding—Daddy Calkins and Malcolm have, their privileges and interests are just the same and Daddy C knows the stock was all put in my name and why—it will be all right with

Daddy when I explain to him—you see as Daddy Calkins says I haven't any business sense and I guess he is right. I saw Malcolm tonight. I didn't want him to tell me any thing again unless he gave me a full explanation. I am going to trust him to run all the business."

It is easy to understand that the effect of such letters would be to allay any anxiety on the part of respondent, and when we recall also the implicit faith he had in his son, his inattention to his interests and his failure to take steps earlier to maintain his rights are not surprising. No doubt his experience was similar to that of many a father who quite naturally, but rather unwisely, has entrusted his own business affairs to the unlimited control of his son.

In considering the record we must, of course, remember that there is no hard-and-fast rule as to what fact or circumstance is required to compel further inquiry upon the part of the injured party and that in such cases there is a wide zone for the exercise of the discretion of the trial judge.

We dismiss this feature of the case with the statement that there is warrant for the claim of respondent that the earliest circumstance which would operate to set the statute in motion is found in the letter to him from appellant of September 19, 1918, in which she stated: "You have never had a true understanding of the Monterey business or that of the 'Turlock Tribune,' some day perhaps if you are interested I will explain all to you. I am not under any obligation to you or to Malcolm for this business, but to my father." But between this as the starting point and the filing of the complaint, on May 21, 1921, less than three years elapsed.

[5] There is force also in the claim of appellant that respondent is properly chargeable with laches. The doctrine, of course, is familiar and as an abstract proposition it does not evoke controversy. It is said to be "an inherent doctrine of equity jurisprudence that nothing less than conscience, good faith, and reasonable diligence can call courts of equity into activity, and that they will not grant aid to a litigant who has negligently slept on his rights and suffered his demand to become stale where injustice would be done by granting the relief asked." (21 Corpus Juris, 212.)

Appellant declares: "While it was doubtful whether Veda H. Calkins could make a success of the "Tribune," plaintiff stood by and waited; when it developed that the paper had become unusually successful, that it was making money, that it had increased fifty per cent in value, that its advertising and circulation was five-fold what it had been, the plaintiff and his son decided that it was time for them to have the fruits of this success and this action followed. This increase in value is one of the elements of laches and generally bars relief. (*Stevenson* v. *Boyd*, 153 Cal. 630 [19 L. R. A. (N. S.) 525, 96 Pac. 284].)"

It is to be noticed, however, that the very case of *Stevenson* v. *Boyd* while emphasizing the importance of diligence and good faith upon the part of the claimant, reaffirms the doctrine, as stated in *Chapman* v. *Bank of California*, 97 Cal. 155 [31 Pac. 896], that "whether or not, under all the circumstances, the delay has been such as to render it inequitable to grant the relief is, in the first instance, a question for the trial court, the determination of which is left to the sound discretion of the chancellor in each case."

Respondent explains the delay in bringing the action, and we cannot say that the trial court was not warranted in accepting the explanation as satisfactory and sufficient. The principal reason was based upon the request and importunity of his son that he forbear bringing the action, as the son hoped to effect a reconciliation with his wife, which the institution of the suit would probably prevent. As claimed by respondent, he was thus placed in a peculiar position—"that of enforcing his rights and possibly preventing a reconciliation between his son and the latter's wife, or waiting to see what developed in the matter." It is undoubtedly true, also, "that the relationship of the parties always has an important bearing on the question of laches and that delay under such circumstances is not as strictly regarded by the courts as in cases where the parties are strangers to each other." (*Dugan* v. *O'Donnell*, 68 Fed. 983.)

It is natural that the trial court should feel inclined to exercise its discretion in favor of respondent, who stripped himself of all his property to invest in the "Cypress" and who is no longer a young man, and one can hardly forego the reflection that appellant might well have offered

to reimburse him with interest for what he put into the "Tribune" and thereby probably have avoided this expensive litigation.

[6] But the court found that plaintiff is the owner of an undivided one-half interest of said business and made its decree accordingly. It is to be remembered that originally three-tenths were purchased and paid for by Newfield and his interest was subsequently bought by appellant. The theory of respondent is that this was paid for out of the proceeds of the business and should be charged with the trust, but we find no evidence to support that view. Of course, if the money came from her own funds the said three-tenths interest should not be included in the partnership property. At any rate, it is admitted by respondent that she contributed directly to the purchase of the "Tribune" the sum of $1,164, which she received from the life insurance of her father. To this should be added the sum of $750 which was borrowed from her father and was used by M. F. Calkins as part of the purchase price of the equipment of the "Cypress." This was given to her, and the gift relieved the partnership from the obligation and thereby increased to that extent the amount available for the purchase of the "Tribune." The effect was the same as though she had actually contributed that sum to the business. Without recapitulating the figures we may say that this would entitle her to approximately one-third of the property and since one-half of the other two-thirds was conveyed to her by M. F. Calkins, respondent at the utmost should be awarded only one-third. And manifestly if it should be shown that she paid Newfield from another independent source, her interest should be increased by that three-tenths.

For the reasons stated the judgment is reversed.

Jones, J., *pro tem.*, and Finch, P. J., concurred.

A petition by respondent for a rehearing of this cause was denied by the district court of appeal on August 27, 1923, and a petition by respondent to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on September 24, 1923.